IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK HARRIS, | |
| Plaintiff, | No. C 08-01810 JSW |
| v. | |
| UNITED PARCEL SERVICE, INC., et al., | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

Now before the Court is the Defendant United Parcel Service, Inc.'s ("UPS") motion for summary judgment. Having carefully reviewed the parties' papers, considered their arguments and the relevant legal authority, the Court hereby GRANTS UPS's motion for summary judgment.[1]

**BACKGROUND**

Plaintiff Mark Harris ("Plaintiff") began working part-time for UPS in 1986 as a hub sorter. (Declaration of Marc L. TerBeek ("TerBeek Decl."), Ex. 6.) Plaintiff was reclassified several times and was promoted to a full-time position in 1994. (*Id.*) On September 1, 1996, Plaintiff obtained a lateral transfer to a full-time position as a package driver. (*Id.*)

Package car drivers are required to work up to nine and a half hours per day and must bend, squat, climb, stand, walk, and be able to lift equipment and/or packages weighing up to seventy pounds. (Declaration of George Thompson, ¶¶ 9, 10.) Timeliness and attendance are

---

[1] The Court GRANTS Plaintiff's request to file a brief in excess of twenty-five pages. The Court addresses some of UPS's evidentiary objections throughout this Order. However, the Court need not rule on the remainder of UPS's evidentiary objections because the Court did not need to consider such evidence in order to resolve the motion for summary judgment.

essential functions of the job and are critically important to UPS's ability to abide by its delivery equipment commitments to its customers. (*Id.*, ¶ 16.)

On July 22, 1997, Plaintiff was treated by Dr. Wiesner for an injury to his left big toe. Plaintiff reported that it was injured by working on a truck with a clutch. (TerBeek Decl., Ex. 7.) Dr. Wiesner diagnosed Plaintiff with "left great toe metatarsalgia" and said that Plaintiff was limited to modified work until August 7, 1997. (*Id.*) During this modified work period, Dr. Wiesner restricted plaintiff to standing or walking no more than fifteen minutes at a time, climbing occasionally, and not repetitively getting in and out of a truck. (*Id.*) Plaintiff submitted a workers' compensation claim for this injury on July 22, 1997. (*Id.*, Ex. 8.) UPS received a copy of this claim on July 24, 1997. (*Id.*, Ex. 9.) Plaintiff received payments of temporary disability benefits from UPS's workers' compensation carrier, Liberty Mutual, from July 22 through August 6, 1997. (*Id.*, Ex. 11.)

On September 11, 1997, Plaintiff was examined by Dr. Fagan for his foot pain. Dr. Fagan restricted him to "light duty" and provided that Plaintiff should return for a recheck in four to five weeks. (*Id.*, Ex. 13.) On October 17, 1997, Dr. Fagan diagnosed Plaintiff with "sesamodiditis due to job aggravation." (*Id.*, Ex. 14.) Dr. Fagan prescribed Plaintiff specialized shoes and shoe inserts and extended his work restrictions to December 2, 1997. He limited Plaintiff to no squatting, kneeling or climbing, bending only occasionally, lifting no more than 26 pounds, and standing or walking for one hour at a time and for no more than four hours a day. (*Id.*) On November 24, 1997, Dr. Fagan extended these work restrictions to January 1, 1998. (*Id.*, Ex. 15.) On this date, Dr. Fagan also signed a certificate of illness and an application for weekly disability benefits on Plaintiff's behalf. (*Id.*, Exs. 16, 17.)

Dr. Fagan examined Plaintiff again on January 12, 1998. Dr. Fagan released Plaintiff to work with no restrictions starting on January 14, 1998, with the recommendation that Plaintiff be assigned to a truck with steps lower to the ground. (*Id.*, Ex. 18.) Plaintiff received temporary disability benefit payments throughout this period. (*Id.*, Ex. 19.)

On April 15, 1999, Dr. Fagan again diagnosed Plaintiff with "sesamodiditis" and restricted Plaintiff from working until June 13, 1999. On May 17, 1999, Plaintiff submitted an

2

application for weekly disability benefits with a statement from Dr. Fagan.  (*Id.*, Exs. 20, 21.)  Plaintiff received temporary disability benefit payments throughout this period.  (*Id.*, Ex. 23.)  When Plaintiff returned to work, UPS accommodated Plaintiff by providing him with a different vehicle.  (*Id.*, Ex. 5 (Deposition of Kim Muniz) at 134:6-136:19.)

On March 21, 2001, Plaintiff injured his finger at work and submitted a workers' compensation claim for this injury.  (*Id.*, Ex. 24.)  Plaintiff received temporary disability benefit payments from Liberty Mutual from March 27 through April 9, 2001.  (*Id.*, Ex. 25.)  On April 4, 2001, UPS sent Plaintiff a letter informing him of his rights and responsibilities under the Family Medical Leave Act.  (*Id.*, Ex. 26.)  Plaintiff was released to return to work on May 24, 2001 and received temporary disability benefit payments from March 27 through May 23, 2001.  (*Id.*, Ex. 27.)

On December 5, 2001,  Plaintiff submitted another workers' compensation claim for an injury to his left knee.  Plaintiff stated that on November 26, 2001, he injured his knee by getting in and out of the truck and by driving with a clutch.  (*Id.*, Ex. 29.)  Plaintiff visited Dr. Weinert on December 3, 2001 for this injury.  (*Id.*)  On August 28, 2002, Liberty Mutual issued a notice of denial of claim for workers' compensation benefits.  Liberty Mutual's stated reason for denying the claim was that Plaintiff advised that he did not wish to file for benefits for this claim because he had been working in his usual and customary job since the date of injury.  (*Id.*, Ex. 31.)

In July 2003, Plaintiff left work with significant pain in his left foot and leg.  He informed his immediate supervisor, as well as Tony Agenjo and Kim Muniz, about his condition and that he was going to seek treatment with Dr. Fagan at Kaiser.  (Declaration of Mark Harris ("Harris Decl."), ¶ 5.)  Plaintiff was treated by Dr. Fagan on August 12, 2003.  According to Dr. Fagan's notes, Plaintiff told Dr. Fagan that he had been unable to work since July 29, 2003.  Dr. Fagan prescribed a cast for Plaintiff and placed the following restrictions on Plaintiff's ability to work through September 15, 2003: no squatting, kneeling, or climbing, bending only occasionally, standing or walking no more than five to ten minutes per hour thirty hours, lifting no more than ten pounds, and not driving a clutch.  (TerBeek Decl., Ex. 32.)  On

3

October 21, 2003, Dr. Fagan prescribed a stiff shoe for Plaintiff and extended these restrictions to November 10, 2003. (*Id*., Ex. 33.) On November 16, 2003, Plaintiff's work restrictions were extended through November 19, 2003. (*Id*., Ex. 34.)[2]

Plaintiff stopped working at UPS in March 2004 and began an official leave of absence on April 12, 2004. (Declaration of John C. Post ("Post Decl."), Ex. A (Deposition of Mark Harris) at 224:18-226:4.) UPS contends that Plaintiff did not submit medical documentation to support his need for leave before commencing it. (Declaration of Cynthia Flaherty ("Flaherty Decl."), ¶ 8.) On April 2, 2004, Plaintiff was treated by Dr. Fagan again. According to Dr. Fagan's notes, Plaintiff told him that he had been unable to work from March 10 through April 12, 2004. From April 12, 2004 through January 1, 2005, Dr. Fagan recommended that Plaintiff not stand or walk any more than forty-five minutes per hour and not work for more than eight

---

[2] Plaintiff argues, without any evidentiary support, that on several occasions prior to April 2004, Plaintiff spoke with Kim Muniz to inquire as to whether there were alternative jobs he could perform that were available, or were going to become available. Plaintiff further argues that he inquired about positions such as Hub Sorter, Vehicle Shifter, CMB Ins./Air Driver, Revenue Recovery Clerk, Customer Counter Clerk, General Office Clerk, Car Washer, Feeder Driver, Feeder Shifter, and Small Sorter. (Opp. at 18.) Plaintiff's argument is insufficient to create a genuine issue of material fact. *See S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*) *v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982) (stating that "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda"). To defeat the motion for summary judgment, Plaintiff was obliged to set forth specific facts supported by admissible evidence, *i.e.*, affidavits or certified deposition testimony, showing that there is a genuine issue for trial. *See id.*; *see also Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact").

Plaintiff, in his declaration, does state that from July of 2003 through November of 2005 he: "had ongoing contact with persons at UPS concerning his condition, including [his] immediate supervisor, Kim Muniz, and Ken White." He further states that "basically advised them that [he] wanted to finish [his] career at UPS, but thought that [he] was going to need a different position to do so given [his] problems with being a package driver even after having been accommodated once with a different vehicle." (Harris Decl., ¶ 6.) Plaintiff also declares that in response his April 2004 note from Dr. Fagan, he was advised that no other positions were available to address his restrictions. (*Id*., ¶ 8.) However, Plaintiff testified in his prior deposition that he never had a conversation with anyone at UPS in which he indicated that he wanted to be considered for positions other than the package car position. (Post Decl., Ex. A (Harris Depo.) at 233:7-10.) He further testified in his deposition that the first time he made any request to be transferred to another position was after he was terminated. (*Id*., Ex. A (Harris Depo.) at 107:6-12.) To the extent Plaintiff seeks to state or imply that he asked for accommodations before he was terminated, such self-serving testimony contradicts his prior deposition testimony. The Court finds that this portion of his declaration is a sham affidavit and is thus stricken under *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991).

4

1 and a half hours per day. However, he placed no restrictions on Plaintiff's ability to lift weight,
2 bend, squat, kneel, or climb. (TerBeek Decl., Ex. 35.)

3      Plaintiff states in his declaration that he provided the note from Dr. Fagan dated April 2,
4 2004 in April and June of 2004. (Harris Decl., ¶ 7.) On May 27, 2004, Plaintiff's manager
5 signed a Leave of Absence Form for Plaintiff. The form states that the reason for the leave is
6 "PTD - Partial/Total Disability" and that the effective date of Plaintiff's leave of absence is
7 March 12, 2004, but then April 12, 2004 is written directly above that date with a question
8 mark. (TerBeek Decl., Ex. 37.) Ms. Muniz explained that she filled out this form, providing
9 that Plaintiff's leave of absence started on March 12, 2004. She thinks that she must have
10 received a doctor's note supporting Plaintiff's leave of absence. (TerBeek Decl., Ex. 5 (Muniz
11 Depo.) at 138:4-20.)

12      UPS issued a letter dated June 2, 2004, informing Plaintiff of his rights and
13 responsibilities during his leave of absence beginning on March 12, 2004 due to a non-work
14 related injury or illness. (TerBeek Decl., Ex. 38.) In this letter, UPS advised Plaintiff that a
15 medical leave of absence is not automatic and that UPS requires Plaintiff to send in the Health
16 & Safety Department medical certification from his health care provider. (*Id.*) On June 24,
17 2004, UPS sent Plaintiff a letter to inform him that UPS had not yet received his "Doctor's
18 Note." (TerBeek Decl., Ex. 39.) In response to this letter, in June 2004, Plaintiff provided the
19 note from Dr. Fagan dated April 2, 2004 again. (Harris Decl., ¶ 7; TerBeek Decl., Ex. 40.)

20      On September 13, 2004, Plaintiff was treated by Dr. Fagan. Dr. Fagan filled out a
21 "Physician's Supplemental Certificate" for state disability benefits in which he states that
22 Plaintiff has problems with extended standing or walking but was "released for light duty from
23 April 12, 2004 through January 1, 2005." (TerBeek Decl., Ex. 41.)

24      UPS contends that it attempted to contact Plaintiff between January and November
25 2005, but could not reach him and that Plaintiff did not provide UPS with any updated medical
26 records for over eleven months after his leave ended in January 1, 2005. (Flaherty Decl., ¶¶ 11,

5

12.)³ Plaintiff testified that he did not provide UPS any medical information between January 1, 2005 and November 15, 2005.  (Post Decl., Ex. A (Harris Depo.) at 88:1-8.)

Plaintiff states that he spoke with Ms. Muniz on November 15, 2005 and advised her that he would get an appointment with Dr. Fagan who would provide him with a final report on his status.  (Harris Decl., ¶ 9; TerBeek Decl., Ex. 36 (Deposition of Mark Harris) at 84:22-85:3.)  On November 25, 2009, he told Ms. Muniz that he had an appointment with Dr. Fagan scheduled for November 29, 2005.  (Harris Decl., ¶ 9.)  On November 29, 2005, Plaintiff provided UPS with an EED disability certificate, signed by Dr. Fagan in September 2004, and a report by Dr. Fagan dated November 29, 2005.  (*Id.*, ¶ 7; TerBeek Decl., Ex. 42.)  In the report dated November 29, 2005, Dr. Fagan stated that Plaintiff restricted Plaintiff to no more than 45 minutes of standing or walking within an hour for a total of five hours, driving only automatic cars, and working no more than eight hours per day.  Dr. Fagan stated that these restrictions were permanent.  (TerBeek Decl., Ex. 42.)  Plaintiff states that in response to his inquiries and the note dated April 2, 2004, he was advised that no "light duty" or TAW work was available.  (Harris Decl., ¶ 8.)

On November 15, 2005, UPS issued a letter stating that Plaintiff had been absent from work with no communication since January 2005 and that he was discharged for job abandonment.  (TerBeek Decl., Ex. 47.)  According to Denise Gasti, UPS would not have discharged Plaintiff for job abandonment if they had any information on his medical status at that time.  (TerBeek Decl., Ex. 48 (Gasti Depo.) at 99:4-12.)  Plaintiff was not allowed to return to work pending this termination.  (Harris Decl., ¶ 11.; TerBeek Decl., Ex. 48 (Deposition of Denise Gasti) at 74:18-22.)  Plaintiff does not recall receiving this termination letter.  (TerBeek Decl., Ex. 36 (Harris Depo.) at 126:4-6.)  Plaintiff's last earning statement from UPS states "3 weeks termination 12/07/2005."  (*Id.*, Ex. 49.)  Plaintiff's employment history with UPS lists December 8, 2005 as his termination date.  (*Id.*, Exs. 6, 5 (Muniz Depo.) at 51:25-52:17.)  Another UPS document from its GEMS system regarding Plaintiff states "pending terminated

---

³ During discovery, Plaintiff produced a doctor's note dated January 13, 2005 clearing Plaintiff to return to work with no restrictions starting on January 17, 2005.  (Post Decl., ¶ 10, Ex. C.)

6

12/08/05." (*Id.*, Ex. 50.) GEMS is a system in which UPS records training, information and activities of its employees, including termination dates. (*Id.*, Ex. 5 (Muniz Depo.) at 43:25-44:9.)

On November 16, 2005, Plaintiff's union filed a grievance on Plaintiff's behalf to protest his discharge letter. (*Id.*, Ex. 52.) December 27, 2005, Plaintiff provided a request for a grievance investigation to his union. (*Id.*, Ex. 53.) In his request, Plaintiff states that he was discriminated against based on his disability. (*Id.*)

On January 19, 2006, UPS sent Mr. Harris a letter informing him that UPS and the union would be reviewing his discharge on January 31, 2006. However, there is a handwritten note on the bottom of this letter stating: "Meeting was reschedule [*sic*]. Business Agent Marty Frates was out sick. 1-31-06." On January 24, 2006, UPS sent Plaintiff another letter stating that UPS and the union would be reviewing his discharge on March 2, 2006. (TerBeek Decl., Ex. 54.) On March 22, 2006, Mr. Frates wrote Plaintiff a letter stating that he met with UPS to discuss his pending discharge on March 1, 2006. UPS advised Mr. Frates that Plaintiff had not yet provided medical records for time off from January 2005 to the present. (*Id.*)

On April 4, 2006, the union filed a grievance on Plaintiff's behalf, protesting that he was terminated due to absenteeism when he was actually off work due to disability and medical appointments. Through this grievance, Plaintiff sought to be appointed to another occupation under seniority. (*Id.*, Exs. 55, 56.)

On April 5, 2006, Plaintiff's grievance of his November 15, 2005 termination was heard by the grievance panel. The panel deadlocked and referred the matter to arbitration. (*Id.*, Ex. 57.)

On March 30, 2006, Plaintiff requested in writing to have his leave of absence extended for one more year. (*Id.*, Ex. 44.) On April 10, 2006, UPS denied the requested extension. (*Id.*, Ex. 45.) Pursuant to the CBA, if a subsequent dischargeable event occurs while an employee's discharge grievance is pending, UPS issues a second discharge letter relating to the new offense. (Declaration of Denise Gasti, ¶ 13.) On April 11, 2006, UPS sent Plaintiff another discharge letter. UPS discharged Plaintiff for being on a leave of absence for more than two

7

years. (*Id*., Ex. 58.) On April 12, 2006, the union filed a grievance on behalf of Plaintiff protesting this discharge and seeking reinstatement. (*Id*., Ex. 59.) On May 8, 2006, the union filed another grievance on behalf of Plaintiff stating that UPS's denial of the requested leave of absence violates state law and seeking to have the leave of absence granted. (*Id*., Ex. 60.)

On July 5, 2006, Plaintiff's grievance of his April 11, 2006 termination was heard by the grievance panel. The union argued that the letter was untimely. The panel found in favor of the union. (*Id*., Ex. 61.) On July 5, 2006, UPS sent Plaintiff another letter discharging Plaintiff for being on a leave of absence for more than two years. (*Id*., Ex. 62.) On April 18, 2007, UPS sent Plaintiff a letter discharging him for being on a leave of absence for more than three years. (*Id*., Ex. 63.)

Plaintiff believed that the grievance process was futile because UPS has not provided him with a working discharge or properly considered the medical documentation he had provided or UPS had received through the workers' compensation process. (Harris Decl., ¶ 14.) Therefore, Plaintiff withdrew his grievances on December 28, 2007 and filed a civil action in this Court. (*Id*., ¶ 15; *see also* Declaration of Denise Gasti, ¶ 25, Ex. F.).)

On April 24, 2007, Plaintiff filed a charge with the California Department of Fair Employment and Housing based on his termination on July 5, 2006. (TerBeek Decl., Ex. 64.) On April 25, 2007, Plaintiff obtained a right to sue letter. (*Id*.)

On October 30, 2007, initiated this action in state court. UPS removed the case to this Court.

UPS's Americans With Disability Act Procedural Compliance Manual ("Compliance Manual") provides in pertinent part:

> The ADA does not require UPS to create a light duty job where no such position currently exists as a means of accommodating disabled individuals. The company maintains a "Temporary Alternate Work ("TAW") program for employees injured on the job, but TAW assignments are only intended to be short-term, and the TAW job should be eliminated when the occupant returns to his regular duties. ... [N]o employee should be placed in a TAW job for an extended period of time. ...

(TerBeek Decl., Ex. 1.)

8

When he worked for UPS, Plaintiff was subject to a collective bargaining agreement ("CBA") between UPS and Plaintiff's Teamsters Union. Pursuant to the CBA, UPS is authorized to provide TAW to employees who are unable to perform their normal work assignments due to an on-the-job injury. (TerBeek Decl., Ex. 3.) Under Article 8 of the Northern California Supplemental Agreement to the CBA:

> [a]ny employee who is unable to work because of sickness or injury shall be deemed to be on a leave of absence. Such leave will not exceed two (2) years unless extended by written consent of the Union and the Employer. In the absence of such consent, a request for extension of such leave shall be subject to dispute procedure, but in no event shall such leave of absence exceed three (3) years, except with the written consent of the Union and the Employer.

(TerBeck Decl., Ex. 3.)

The Court will address additional specific facts as required in the analysis.

## ANALYSIS

**A.  Summary Judgment Standard.**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if the fact may affect the outcome of the case. *Id.* at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for

9

1 the moving party. *Id.* Once the moving party meets this initial burden, the non-moving party
2 must go beyond the pleadings and by its own evidence "set forth specific facts showing that
3 there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party must "identify
4 with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*,
5 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251
6 (7th Cir. 1995)) (stating that it is not a district court's task to "scour the record in search of a
7 genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving
8 party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

9 **B.    UPS's Motion for Summary Judgment.**

10     **1.    Plaintiff's Statutory Claims.**

11         **a.    Statute of Limitations**

12 UPS contends that all of Plaintiff's statutory claims are barred by the applicable one-
13 year statute of limitations. Under the California Fair Housing and Employment Act ("FEHA"),
14 a plaintiff must file an administrative charge within one year after the alleged unlawful practice
15 occurred. Cal. Gov't Code § 12960. Plaintiff was first terminated in November or December of
16 2005, but he did not file an administrative charge with the DFEH until April 24, 2007. Thus,
17 unless Plaintiff's claims were tolled, his statutory claims are time-barred.

18 Plaintiff argues that his claims were tolled during the pendency of his grievances.
19 Pursuing a grievance may toll the statute of limitations if the grievance gave UPS timely notice
20 of Plaintiff's claims against it. *Addison v. Cal.*, 21 Cal. 3d 313, 319 (1978). Plaintiff submits a
21 request for a grievance investigation dated December 27, 2005, in which he states that he
22 suffered an industrial injury and that he informed his employer of such injury. Nevertheless,
23 knowing he was disabled, his employer terminated his employment. (TerBeek Decl., Ex. 53.)
24 Although this appears to be an internal document between Plaintiff and his union, UPS
25 produced this document during discovery. (*Id.*, ¶ 48.) Therefore, the Court finds that Plaintiff
26 has submitted sufficient evidence to establish a question of fact regarding whether Plaintiff gave
27 UPS timely notice of his claim that he was terminated because of his disability.

28

10

However, Plaintiff has not presented *any* evidence to show that the grievance proceedings provided any notice to UPS that Plaintiff was claiming he was discriminated against based on age or race, or retaliated against and, thus, such claims under FEHA are time barred. Therefore, the Court will grant summary judgment based on the statute of limitations on Plaintiff's claims of age and race discrimination and retaliation under FEHA.

**b.      Plaintiff's Race and Age Discrimination Claims.**

Moreover, to establish a prima facie case of discrimination based on race or age, Plaintiff must establish that he suffered an adverse employment action that was motivated by intentional discriminatory animus. *See, e.g., Guz v. Bechtel National, Inc*., 24 Cal. 4th 317, 353-58 (2000). Whether Plaintiff can meet his burden to establish a prima facie case of discrimination is a matter of law to be determined by the court. *Caldwell v. Paramount Unified School District*, 41 Cal. App. 4th 189, 201 (1995).

First, Plaintiff must establish a prima facie case of discrimination. *See Guz*, 24 Cal. 4th at 351-54. If the Plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Then, in order to prevail, Plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision was a pretext for another, discriminatory motive. *See id.*; *see also Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1061 (9th Cir. 2002).

Plaintiff may establish a prima facie case of discrimination based on age or race by demonstrating that (1) he was a member of a protected class, (2) he was performing competently in the position he held, (3) he suffered an adverse employment action, and (4) some other circumstance suggests discriminatory motive. *See Guz v. Bechtel National, Inc*., 24 Cal. 4th 317, 355 (2000); *see also Gibbs v. Consol. Servs.*, 111 Cal. App. 4th 794, 799 (2003). Here, Plaintiff has not submitted any evidence to show that he was performing satisfactorily at the time of the adverse action. In fact, it is undisputed that Plaintiff was out on leave, and not working at UPS, when he was terminated. Moreover, Plaintiff has not submitted any admissible evidence to show that UPS terminated Plaintiff or failed to accommodate him because of his

1  race or age.[4]  Therefore, Plaintiff has not demonstrated a prima facie case of discrimination on
2  the basis of race or age.  The Court thus grants UPS's motion for summary judgment on
3  Plaintiff's claims premised on race or age discrimination.

### c. Plaintiff's Retaliation Claim.

5  To establish a prima facie case of retaliation, Plaintiff "must show (1) he or she engaged
6  in a 'protected activity,' (2) the employer subjected the employee to an adverse employment
7  action, and (3) a causal link existed between the protected activity and the employer's action."
8  *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005).  UPS argues that Plaintiff has
9  no evidence to show any causal connection between any protected activity by Plaintiff and
10 UPS's actions.  Plaintiff fails to even argue that he demonstrated these essential elements of his
11 retaliation claim, let alone submit any supporting evidence.  Therefore, the Court grants
12 summary judgment on his retaliation claim.

### d. Plaintiff's Disability Discrimination Claims.

14 Plaintiff's disability discrimination claims are premised both on UPS's alleged failure to
15 accommodate him and his termination allegedly based on his disability.  To establish a prima
16 facie case of disability discrimination, Plaintiff must show that he: (1) suffers from a disability,
17 (2) can perform the essential functions of his job with or without reasonable accommodation;
18 and (3) was subjected to an adverse employment action because of his disability.  *See Jensen v.*
19 *Wells Fargo Bank*, 85 Cal. App. 4th 245, 254-55 (2000).  Plaintiff bears the burden to
20 demonstrate that he was able to preform the essential functions of his job, with or without
21 reasonable accommodation.  *Green v. State*, 42 Cal. 4th 254, 262 (2007).

22 Plaintiff has not demonstrated that he could perform the essential function of his job
23 with or without reasonable accommodation.  The medical information he provided on
24 November 29, 2005 stated that his medical restrictions were permanent.  Those restrictions
25 provided that Plaintiff could stand or walk no more than 45 minutes within an hour for a total of
26 five hours, could only drive automatic cars, could not squat, could only lift packages between
27 10 and 40 pounds occasionally, and could work no more than eight hours per day.  (TerBeek

---

[4] The Court sustains UPS's objections to the Declaration of Elsy Barreras, ¶ 7.

12

1  Decl., Ex. 42.) Such limitations preclude Plaintiff from being able to perform the essential
2  functions of his car package position, which include bending, stooping, crouching, squatting,
3  standing, siting, walking and turning/pivoting up to 9.5 hours per day, five days per week,
4  occasionally lifting equipment and/or packages up to 70 pounds, and operating a standard
5  transmission. (Declaration of George Thompson ("Thompson Decl."), ¶¶ 9-10, Ex. A.).
6  Therefore, Plaintiff fails to demonstrate a prima facie case of employment discrimination based
7  on his disability.[5]

8  To establish a prima facie case that UPS failed to accommodate him, Plaintiff must
9  show that he could perform the essential functions of the job he sought with or without
10  reasonable accommodations. *See Jensen*, 85 Cal. App. 4th at 256. It is undisputed that UPS
11  provided him with a leave of absence from April 12, 2004 at the latest though November 15,
12  2005. Plaintiff contends that he should have been provided a longer leave. However, on
13  November 29, 2005, Plaintiff submitted information from his doctor stating that his medical
14  limitations were permanent. Therefore, Plaintiff has not shown that providing him with
15  additional leave would have assisted him in being able to return to work eventually. *See*
16  *Jensen*, 85 Cal. App. 4th at 263 ("Holding a job open for a disabled employee who needs time
17  to recuperate or heal is in itself a form of reasonable accommodation and may be all that is
18  required *where it appears likely that the employee will be able to return to an existing position*
19  *at some time in the foreseeable future*.") (emphasis added); *see also Hanson v. Lucky Stores,*
20  *Inc.*, 74 Cal. App. 4th 215, 226 (1999) (a finite leave can be a reasonable accommodation under
21  FEHA, *provided it is likely that at the end of the leave, the employee would be able to perform*
22  *his or her duties*") (emphasis added). As the court in *Hanson* made clear, "[a]n employer is not
23  required to offer an accommodation that is likely to be futile because, even with
24  accommodation, the employee could not safely and efficiently perform the essential functions

---

[5] Plaintiff also contends that UPS discriminated against him by not providing him with a "working discharge." However, a working discharge provides that an employee "shall be allowed to remain on the job" pending the grievance procedure. (TerBeek Decl., Ex. 4.) Here, Plaintiff was not working at the time he was terminated and, as discussed above, could not perform the essential functions of his job at the time at his termination. Therefore, it is not clear how UPS could have provided him with a "working discharge."

13

of the job." *Hanson*, 74 Cal. App. 4th at 226 (citation omitted). Due to the permanence of Plaintiff's medical restrictions, providing additional leave was likely to be futile.

To the extent Plaintiff contends that he sought Temporary Alternative Work ("TAW"), pursuant to the Collective Bargaining Agreement, TAW could only last for thirty days. (Gasti Decl., ¶ 24; *see also* TerBeek Decl, Ex. 1 ("TAW assignments are only intended to be short-term. ... [N]o employee should be placed in a TAW job for an extended period of time.").) Plaintiff had long exhausted his ability to take TAW through his many medical leaves. (Gasti Decl., ¶ 24.)

Plaintiff further argues that UPS failed to accommodate him by placing him in another position, but Plaintiff admits that he did not request such accommodation until after he was terminated. Moreover, Plaintiff has not demonstrated that there were available positions for which he was qualified. The positions open in Plaintiff's collective bargaining unit between April 30, 2004 and April 30, 2006 were package car driver, revenue recovery clerk, unloader/loader, trailer mechanic (but Plaintiff needed to have been a mechanic journeyman to qualify for that position), sorter center clerk, customer counter clerk, feeder, and driver. (Declaration of John C. Post in Support of UPS's Reply, Ex. B (Deposition of George Thompson) at 74:24-78:24.) The essential functions of driver transfer and feeder driver include bending, stooping, crouching, squatting, standing, siting, walking and turning/pivoting up to 9.5 hours per day, five days per week, occasionally lifting equipment and/or packages up to 70 pounds, and operating a standard transmission. (Thompson Decl., Ex. A.) The essential functions of the sorter position include bending, stooping, crouching, squatting, standing, walking and turning/pivoting eight plus hours per day, five days per week and continuously lifting, lowering, pushing and pulling packages that occasionally weigh up to 70 pounds. (*Id.*) The essential functions of a loader/unloader include bending, stooping, crouching, squatting, crawling, climbing, standing, walking and turning/pivoting up to 9.5 hours per day, five days per week and continuously lifting, lowering, pushing and pulling equipment and/or packages that occasionally weigh up to 70 pounds. (*Id.*) Based on these essential functions, Plaintiff was not qualified due to his medical restrictions. It is not clear if sorter is the same position as sorter

14

center clerk or what the essential functions of a customer counter clerk or revenue recovery clerk are. Plaintiff did not provide any evidence, and thus failed to demonstrate, that he could have preformed the essential functions of these positions.[6] Accordingly, the Court grants summary judgment on Plaintiff's claims that UPS discriminated against him based on his disability and failed to provide him with reasonable accommodations.

### 2. Plaintiff's Breach of Contract Claim.

Despite the Court's dismissal of Plaintiff's breach of contract claim based on preemption and permission to file a claim under Section 301 of the Labor and Management Relations Act, 29 U.S.C. § 185 ("Section 301"), Plaintiff filed another breach of contract claim in his third amended complaint. Plaintiff's breach of contract claim is completely preempted by Section 301. *Caterpillar Inc. v. Williams*, 482 U.S. 382, 394 (1987). Therefore, the Court will construe Plaintiff's breach of contract claim as a Section 301 claim.

To pursue a breach of contract claim pursuant to Section 301, Plaintiff must first exhaust the applicable contractual grievance procedures, *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 617 (9th Cir. 1981), unless an exception to the exhaustion requirement is applicable. *See Kaylor v. Zellerbach, Inc.*, 643 F.2d 1362, 1366 (9th Cir. 1981). An employee is not required to exhaust the grievance procedures "when the employer's conduct amounts to a repudiation of the contractual remedy, or when the union has the sole power to file a grievance and it has wrongfully refused to do so." *Id*. (citing *Vaca v. Sipes*, 386 U.S. 171, 185 (1967)) (finding repudiation where the employer denied that it was bound by the collective bargaining agreement or that it had any duty towards the plaintiffs). Courts "will not find repudiation simply because the employer refused to follow one or more of the substantive terms of the CBA; rather, [courts] will excuse the requirement for exhaustion based on repudiation only if the employer repudiates the specific grievance procedures provided by the CBA." *Sidhu v. Flecto Co., Inc.*, 279 F.3d 896, 898-99 (9th Cir. 2002) (finding repudiation where employer stated in writing that it would not, and was not willing to, process the employee's grievance).

---

[6] Plaintiff cites to, but failed to provide, his deposition at pages 295 through 306. (Opp. at 24.)

15

Upon review of the record, the Court finds that Plaintiff has not demonstrated a question of fact regarding whether UPS repudiated the grievance procedure. In fact, the evidence demonstrates that UPS fully participated in the grievance process and procedures. The delay in hearing the initial grievance was due to Plaintiff's agent Mary Frates being sick and then Plaintiff's delay in providing his medical information. (TerBeek Decl., Ex 54.)

Although Plaintiff became frustrated with UPS's repeated notices of discharges, pursuant to the CBA, it is UPS's practice to sent out a discharge notice for every dischargeable event when grievances are pending. (Gasti Decl., ¶ 13.) Plaintiff has not submitted any evidence to show that UPS repudiated or refused to follow the grievance procedures for any grievance filed. Therefore, the Court finds that Plaintiff has not demonstrated that exhaustion was futile. Accordingly, the Court grants summary judgment on Plaintiff's breach of contract claim, construed as a claim under Section 301.

### 3. Plaintiff's Other Claims.

Plaintiff also brings claims that he was terminated and retaliated against in violation of public policy and in violation of California Business and Professions Code § 17200 ("Section 17200"), and that such conduct constituted intentional infliction of emotional distress. However, these claims are entirely derivative of his claims that he was discriminated against based on his disability, race, and age and retaliated against that the Court has found fail as a matter of law. Plaintiff has not submitted sufficient evidence to demonstrate a prima facie case as to any of these claims. Therefore, Plaintiff has not presented sufficient evidence to create a question of fact regarding whether UPS violated any law, committed any unlawful business practice, or engaged in any extreme and outrageous behavior necessary for his claims for termination and retaliation in violation of public policy, under Section 17200, and intentional infliction of emotional distress. For the same reasons, Plaintiff has not submitted any evidence, let alone clear and convincing evidence, that UPS engaged in oppression, fraud, or malice to support punitive damages. Accordingly, the Court grants summary judgment on Plaintiff's violation of public policy claims, intentional infliction of emotional distress claim, unlawful business practice claim and request for punitive damages.

16

**CONCLUSION**

For the foregoing reasons, the Court GRANTS UPS's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: July 1, 2009

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE